IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANKLIN S. PIERCE,

        Plaintiff,

vs.                                                                                                         CIVIL No. 03-0485 RLP

JO ANNE B. BARNHART,
Commissioner, Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

1.     Plaintiff, Franklin S. Pierce, brings this action seeking judicial review of the decision of Defendant, the Commissioner of Social Security, denying his applications for a period of disability and disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI of the Social Security Act. For the reasons stated herein Plaintiff's Motion is granted.

**I.**     **Procedural Background**

2.     Plaintiff filed applications for disability income benefits and supplemental security income on May 22, 2001, alleging an onset of disability of May 13, 2001.[1] (Tr.293, 273, 445). His applications were denied twice on administrative review, and again on November 20, 2002, by an Administrative Law Judge following a hearing. ("ALJ" herein). (Tr.273, 448, 274, 453,14-22). The Appeals Council declined review on March 21, 2003 (Tr. 12), rendering the ALJ's November 20, 2002, decision the final decision of the Commissioner of Social Security.

---

[1] Plaintiff filed previous applications for SSI and DIB in January 1999. (Tr. 1,3, 81-96,100). An Administrative Law Judge denied these claims on July 26, 2000. (Tr. 31-48). There no record of a request to have this denial reviewed by the Appeals Council. No request was made to reopen the denial of these applications, and the ALJ reviewing the applications currently under consideration specifically declined to do so. (Tr. 17-18).

## II.     Factual Background

### A.     Prior to May 13, 2001, date of alleged onset of disability.

3.     Plaintiff was born on March 6, 1973. (Tr. 100). Cognitive and behavioral deficits were identified by age four and continued throughout elementary and secondary schooling. (T. 251, 272, 157-163, 226). He graduated from high school at age twenty (Tr. 116) but continued to demonstrate behavioral problems, mood swings and cognitive deficits. (Tr. 188-199, 207-211, 266-269, 188-197, 185, 111). In addition to numerous other short term jobs, he was employed as a dishwasher in a restaurant for two months in 1998 and again in 1999, as a bus cleaner for a charter bus service for four to five months in 1998, and as a rest area attendant for 10 months in 2000-2001. (Tr. 313-314).

4.     In January 1999 the Department of Vocational Rehabilitation referred Plaintiff to Barry K Hughes, PhD., for psychological evaluation. (Tr. 371-374). Dr. Hughes interviewed Plaintiff and his mother, reviewed 1993 neuropsychological and psychological evaluations[2] and conducted a mental status examination. He noted that Plaintiff exhibited marked immaturity in interactions with others, periods of depression, irritability, trouble sleeping, decreased energy and appetite, poor motivation, poor motor skills, poor boundaries, difficulty relating socially, impulsivity and agitation. Dr. Hughes diagnosed Major Depression, Recurrent, probable history of pervasive Developmental Disorder, rule out Bipolar Disorder (Axis I) and Mixed personality features (Axis II). He concluded Plaintiff needed psychiatric evaluation for possible medication management to stabilize his mood and impulsivity, counseling, job training that was "hands on" in nature and not academically oriented, and a job that was "fairly routine and not require a lot of quick adjustments to new situations." Even with these measures, Dr. Hughes stated that Plaintiff's prognosis was guarded at best, and that he would need

---

[2]See Tr. 188-199 and 207-213.

long term vocational supports due to multiple psychological and behavioral problems. (Tr. 228-229).

5.     Plaintiff was seen at Southwest Counseling Center ("SCC" herein) intermittently from November 1998 through October 2001. On September 3, 1999, a physician at SCC interviewed Plaintiff, his parents and his therapist, and conducted a mental status examination. (Tr. 262-267). He diagnosed Major Depressive Disorder and Mood Disorder due to possible frontal lobe syndrome, assigned a GAF score of 45[3] and prescribed anti-depressant medication. Different medications were tried, and shortly after being placed on Zoloft Plaintiff reported doing well, with decrease in mood swings and anger outbursts, good focus, sleep and appetite. (Tr. 260, 253-256, 401).

6.     Plaintiff began working part time as a rest area attendant in May 2000.[4] (Tr. 313-314). In August he reported no mood swings or outbursts. (Tr. 397). In October he reported renewed problems with mood swings, verbal outbursts and becoming easily frustrated at work. His dosage of Zoloft was increased. (Tr. 396). Plaintiff was seen at SCC on February 6, 2001 (Tr. 395). He reported that he had been missing work, going in late, and that he was tired, bored, irritable and depressed. His dosage of Zoloft was again increased. (Tr. 395). On April 3, 2001, Plaintiff reported that he had no medication side effects, was doing a lot with his girlfriend, that he had no rages or explosiveness, spent a lot of time on the internet and had no symptoms of depression. (Tr. 394). He remained stable, with no reported symptoms of depression as of May 1, 2001. (Tr. 393). In April/

---

[3] "GAF" stands for "Global Assessment of Functioning Scale." A score of 45 indicates the clinician's evaluation that a patient is experiencing "serious symptoms . . .or any serious impairment in social, occupational or school functioning." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., p. 32.

[4] In written materials, Plaintiff stated that he worked at this job three days a week for four hours a day, and that his job duties included cleaning rest rooms, picking up and emptying trash and watering plants. (Tr. 14).

May 2001, Plaintiff worked full time as a gas station attendant for a three week period. (Tr. 446, 305, 313, 317).

**B.     After May 13, 2001.**

7.    On May 29, 2001, Plaintiff reported to a nurse at SCC that he was doing well on his medication, that he continued to work for his mother[5] and had no depressive symptoms. No problems were noted. (Tr. 391). With the help of his mother, Plaintiff filled out a daily activities questionnaire in June 2001. (Tr. 321-326). He listed his activities as playing on the computer, talking on the telephone, driving to town and visiting with friends, going to auto races and movies, Kareoke, playing cards and watching TV. (Tr. 321-322). He stated that he had no problems getting along with family, friends or neighbors, but that he frequently did not understand what people in authority were telling him and was frustrated and overwhelmed by activities that required more than two steps to perform, that he responded to criticism by losing his temper, yelling, stomping and denying everything, and that he had been fired from all his past jobs. (Tr. 322-325).

8.    Plaintiff was evaluated by Juan Sosa, PhD, on July 26, 2001, at the request of the Disability Determination Unit. (Tr. 376-385). Dr. Sosa interviewed Plaintiff, conducted a mental status examination and administered psychological tests.[6] Dr. Sosa noted that Plaintiff was very cooperative and focused during testing, followed directions without difficulty and seemed interested. (Tr. 377). He described Plaintiff as

> (C)asually dressed and poorly groomed. His speech and stream of thought were clear

---

[5]Plaintiff had work intermittently since 1999 in a flower shop owned or managed by his mother. (Tr. 141, 147, 258, 401).

[6]Wechsler Adult Intelligence Scale-III (WAIS-III) and Wide Range Achievement Test-3 (WRAT-#3).

> and coherent. However at times he made inappropriate sounds and statements that were rather immature and out of place. He related in a jovial and friendly manner. He was well oriented in all three spheres. His judgment seems marginal and he demonstrated inappropriate gestures and statements to this mother when she asked him to follow a certain schedule after the appointment. He appeared to be of average intelligence. His memory was intact for both recent and remote events. Evidence to suggest the presence of perceptual deviations was not readily available. After the session was ended he walked outside and discovered that his automobile was towed because he parked in a reserved space. He became very angry and made several threats. It was very difficult for him to compose himself and handle the situation rationally.

(Tr. 377).

Testing administered by Dr. Sosa indicated that Plaintiff was of average intelligence, but had significant problems with memory, concentration, verbal comprehension and processing speed. (Tr. 377-378). Dr. Sosa diagnosed Major Depression, Moderate, Recurrent per history, and assigned a GAF of 60.[7]

9.   A non-examining consultant, Scott Walker, PhD., evaluated the medical record in August 2001. In his opinion, Plaintiff had *moderate limitation* in his ability to:

- maintain attention and concentration for extended periods;

- sustain an ordinary routine without special supervision;

- complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- accept instructions and respond appropriately to criticisms form supervisors;

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

---

[7]GAF score of 60 indicates the clinician's evaluation that a patient is experiencing "Moderate symptoms. . .or moderate difficulty in social, occupational or school functioning." *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., p. 32.

- be aware of normal hazzards and take appropriate precautions;

- set realistic goals or make plans independently of others;

*marked limitation* in his ability to:

- Interact appropriately with the general public;

but *no limitation* in his ability to:

- Understand and remember very short and simple instructions or detailed instructions;

- Carry out very short and simple or detailed instructions;

- Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;

- Work in coordination with or proximity to others without being distracted by them;

- Make simple work-related decisions;

- Ask simple questions or request assistance;

- Maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;

- Be aware of normal hazzards and take appropriate precautions.

(Tr. 422-423; See also Tr. 425-438).

Dr. Walker wrote that Plaintiff's life long behavioral problems had improved with the use of antidepressant medication, that he was able to perform the complex tasks of operating a computer and attending computer classes, and that his social inappropriateness and problems with anger management would limit him to jobs that did not require much interpersonal contact. (Tr. 423).

10. Plaintiff was seen at SCC on two more occasions prior to his administrative hearing, on September 11 and October 17, 2001. He was described as "doing well" and "stable" on current medication. (Tr. 389, 287).

11.     Plaintiff started classes at a business skills school shortly after Dr. Sosa's evaluation. (Tr. 377). At the time of his administrative hearing fourteen months later he reported that he was taking computer classes, attending school four hours a night, three nights a week, and maintaining a C average. (Tr. 63-64, 71).

### III.    ALJ's Findings

12.     The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 13, 2001, his alleged date of onset of disability (step 1); that he suffered from emotional and cognitive impairments, including Major Depressive Disorder, that had a significant effect on his ability to perform basic work related activities (step 2); that these impairments did not meet or equal a listed impairment (step 3); that Plaintiff's testimony regarding the extent of his impairments was not consistent with evaluations made by his mental care givers or with his admitted activities; that Plaintiff retained the residual functional capacity for routine, repetitive work that did not require interaction with the general public and which could be performed at a moderate pace; and that Plaintiff could perform his past relevant work as a dishwasher, bus cleaner and rest area attendant. (Step 4).

### IV.    Issues on Appeal

13.     Plaintiff raises numerous issues. The court finds Plaintiff's contention that the ALJ erred in evaluating his mental residual functional capacity determinative.

### V.    Standard of Review.

14.     The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . " *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether

correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994).

**VI.     Discussion.**

15.    The Commissioner has established a special technique to evaluate the severity of mental impairments for adults claiming a disability under the Social Security Act. 20 C.F.R. §404.1520a, 20 C.F.R. §416.920a (2001). Sections 404.1520a and 416.1520a were amended in 2000. The new rules became effective on September 20, 2000, were before Plaintiff's administrative hearing and the ALJ's written decision. 65 Fed.Reg. 507746- 01 (2000). The new regulations abolished the requirement that the ALJ append a Psychiatric Review Technique form to his decision. Instead, the ALJ must now include in his or her decision specific findings rating the degree of limitation in (1) daily living, (2) social functioning, (3)concentration, persistence or pace and (4)episodes of decompensation. The degree of limitation in the first three areas of functioning must to be rated as none, mild, moderate, marked or extreme. The last area is rated by noting the number of occurrences. 20 C.F.R. §404.1520a(e)(2)(2001), 20 C.F.R. §920a(e)(2) (2001), §404.1520a(c)(4) (2001), §416.920a(c)(4) (2001).

16.    The ALJ acknowledged that 20 CFR §§ 404.1520a and 416.920a provide "guidance" in assessing the impact of mental impairments. (Tr. 19). However, he did not rate any of the areas of functioning in the required manner. Accordingly, I find that the ALJ failed to apply correct legal standards.

17.    On remand the Commissioner shall assess Plaintiff's mental residual functional capacity in the matter required by the applicable regulations. In addition, the Commissioner shall comply with the requirements of *Winfrey v. Chater*, 92 F.2d 1017, 1023 (10th Cir. 1996), documenting the requisite three-phase evaluation pertinent to Plaintiff's past relevant work.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand [Docket No. 11] is granted. This matter is remanded to the Commissioner of Social Security for Additional Proceedings including assessment of Plaintiff's mental residual functional capacity in the manner required by 20 CFR §§ 404.1520a and 416.920a. In addition, the Commissioner shall comply with requirements of *Winfrey v. Chater*, 92 F.2d 1017, 1023 (10th Cir. 1996) in assessing Plaintiff's ability to return to past relevant work.

Richard L. Puglisi
United States Magistrate Judge
(sitting by designation)